# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 11, 2025          Decided July 24, 2026

No. 25-7017

PHANTOMALERT INC.,
APPELLANT

v.

APPLE INC.,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:24-cv-00786)

---

*Matthew I. Summers* argued the cause for appellant. With him on the briefs was *Thomas C. Willcox.*

*Deborah Elman* and *Bruce E. Gerstein* were on the brief for amici curiae Professor Eric A. Posner and the American Antitrust Institute in support of appellant.

*Julian Kleinbrodt* argued the cause for appellee. With him on the brief was *Cynthia Richman*.

Before: PILLARD, WALKER and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

2

PILLARD, *Circuit Judge*: When the Covid-19 pandemic struck in March 2020, PhantomALERT retrofitted its mobile traffic app to enable users to spot, report, and avoid viral outbreaks. But Apple barred that update from the App Store, explaining that PhantomALERT's revamped app failed to meet new guidelines Apple had put in place to ensure the reliability of Covid-19-related information. PhantomALERT sued Apple in federal district court here, claiming that the tech company violated the Sherman Antitrust Act and California antitrust and unfair-competition law by tying the sale of Apple devices to use of the App Store and by monopolizing a market consisting of means to access apps on the iPhone in the United States. When plaintiff did not submit a brief in opposition to Apple's motion to dismiss—instead responding only by attempting to file an amended complaint—the district court dismissed PhantomALERT's original complaint without prejudice and denied leave to late-file the proffered amended complaint as futile for failure to plead a relevant antitrust market. This appeal followed.

We conclude that the district court's dismissal order was final and appealable, and we affirm. The amended complaint fails to state a claim under the Sherman Act because it does not plausibly allege a relevant product market, and PhantomALERT does not dispute that its remaining state-law claims must follow the federal claims out the door.

**I.**

**A.**

The Sherman Antitrust Act of 1890 makes a "basic distinction between concerted and independent action," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (citation omitted), embodied in its two primary provisions.

Section 1, regarding concerted action (such as by contract), "declare[s] . . . illegal" "[e]very contract . . . in restraint of trade." 15 U.S.C. § 1. Tying arrangements—in which a seller of a "tying" good requires buyers to purchase a separate, "tied" good—violate Section 1 of the Sherman Act "as contracts in restraint of trade" when they suppress competition in the market for the tied good. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34 (2006). To show that a tying arrangement is illegal *per se*, a plaintiff must establish, among other things, that the tying and tied goods are two separate products, the defendant "has market power in the tying product market," and the "tying arrangement forecloses a substantial volume of commerce." *United States v. Microsoft*, 253 F.3d 34, 85 (D.C. Cir. 2001) (en banc) (per curiam).

Absent that showing of *per se* illegality, a plaintiff may rely on the "rule of reason" framework, which is the "prevailing standard of analysis" for Section 1 cases generally. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). At its core, the purpose of the rule of reason is to determine "whether the challenged [action] is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Pro. Engr's v. United States*, 435 U.S. 679, 691 (1978). Under the rule of reason's "burden-shifting framework," a plaintiff must first show that the challenged tie causes substantial anticompetitive effects in the market for the tied good. *Ohio v. Am. Express Co.* (*Amex*), 585 U.S. 529, 541 (2018); *see Microsoft*, 253 F.3d at 95. If the plaintiff meets that burden, the defendant can avoid liability by showing that there is nonetheless a procompetitive rationale for the tie, *see Amex*, 585 U.S. at 541; *Microsoft*, 253 F.3d at 95, for instance, that buyers find packaged sales in the market "attractive," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (allowing hospital's tying of anesthesiology services with surgeries). Once that is shown, the burden then shifts back to

the plaintiff to "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Amex*, 585 U.S. at 541-42; *Microsoft*, 253 F.3d at 95.

Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize." 15 U.S.C. § 2. That ban, which extends to "unilateral activity," *Copperweld*, 467 U.S. at 768, has "two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 50 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Thus, "having a monopoly does not by itself violate" Section 2. *Id.* at 58. A firm whose product or service dominates a market because it offers better value than any potential substitute product or service does not monopolize unlawfully; to be viable, a plaintiff's Section 2 claim must further allege that the monopolist has engaged in anticompetitive conduct. Anticompetitive conduct under the Sherman Act means protection of a monopoly position "through a means other than competition on the merits." *Id.* at 62; *see id.* at 65. As it is for most Section 1 claims, anticompetitive conduct supportive of Section 2 claims is evaluated under the rule of reason's burden shifting analysis. *See id.* at 59.

**B.**

In its memorandum opinion, the district court reviewed the amended complaint and concluded that it failed to state a claim for relief. Our factual recitation accordingly draws from the facts as the amended complaint alleges them, with reasonable inferences drawn in plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007).

Since 2010, PhantomALERT has provided a traffic app that crowdsources real-time traffic data, similar to the more widely known Waze, and has made its app available via monthly, annual, and lifetime paid subscription options. During that time, PhantomALERT's traffic app "experienced a healthy demand on the App Store for displaying live traffic safety information, road hazards, natural disaster alerts and other information to help drivers drive alert, safely and thus ticket free." Am. Compl. ¶ 18 (J.A. 73). In the wake of the March 2020 outbreak of Covid-19 in the United States, PhantomALERT "revamped" that app to include Covid-19 "hotspot map data and reporting," and had plans to add "symptom, test result and vaccination reporting, tracking, tracing and mapping features." *Id*. ¶ 21 (J.A. 74). On March 14, 2020, however, Apple "announced changes to the App Store Review Guidelines," limiting the App Store's distribution of apps "related to COVID-19" to "recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions." *Id.* ¶ 27 (J.A. 77). Apple's new Guidelines also required apps in "highly-regulated fields," including healthcare, to be "submitted by a legal entity that provides these services, and not by an individual developer." *Id.*

Apple's Developer Program License Agreement requires app developers to submit for Apple's review any app they seek to have included in the App Store to enable Apple to ensure the new or updated app complies with Apple's guidelines. Pursuant to that requirement and its new Covid-19-related Guidelines, Apple rejected PhantomALERT's update for its app; the Google Play Store, where plaintiff sought to publish the Android version of its app, did likewise under its own policy banning all COVID-related apps. Days after rejecting PhantomALERT's app, Apple launched its own Covid-19 app

in collaboration with the federal government. Apple invited PhantomALERT to "mak[e] the necessary changes to be in compliance with the App Store Review Guidelines and . . . resubmit[] [its] revised [app]." *Id.* ¶ 33 (J.A. 78). According to PhantomALERT, hundreds of similar apps were rejected under Apple's and Google's policies limiting the COVID-related apps that users could access on iPhones and Androids.

A couple of months later, in May 2020, Apple published more new rules for contact-tracing apps. The new rules required that exposure-notification apps merely be "endorsed or approved by a governmental entity," not—as before—issued by one, and prohibited those apps from including any advertising. *Id.* ¶¶ 43-44 (J.A. 82). That rule change appeared in Apple's "Exposure Notification Addendum" to the Developer Program License Agreement, *id.* ¶¶ 42-44 (J.A. 82), but PhantomALERT alleges that it never received notice of such a change and, had it been notified, "would have pursued" the endorsement-or-approval option, *id.* ¶ 45 (J.A. 83). At least seven contact-tracing apps in addition to Apple's own such app were approved for use in the United States under the new guidelines.

PhantomALERT sued Apple on March 26, 2024, and Apple moved to dismiss the complaint for failure to state a claim. Plaintiff got an extension until July 10 to file its response to Apple's motion. Minute Order of June 20, 2024 (J.A. 3). On July 11, 2024—a few minutes past the July 10 deadline—PhantomALERT filed an amended complaint unaccompanied by any brief in opposition to Apple's motion to dismiss. *See* Am. Compl. (J.A. 62-98); Op. 3-4 (J.A. 227-28).

Plaintiff's proffered amended complaint alleges that Apple's longstanding policy of preventing its customers from accessing apps outside the App Store, coupled with its shifting guidelines that barred PhantomALERT from offering its revamped app on the App Store, violated federal and state antitrust law and state unfair competition law. Am. Compl. at 3-7 & ¶¶ 12, 17 (J.A. 64-68, 70, 73). The amended complaint contains five counts: unlawful tying of the iPhone to the App Store, in violation of Sherman Act Section 1 (Count I); monopolization of "access to apps on iPhones," in violation of Sherman Act Section 2 (Count II); monopolization of "access to Covid-19-related tracing apps in the App Store for use in the United States," in violation of Sherman Act Section 2 (Count III); violation of the California Cartwright Act, a state antitrust law (Count IV); and violation of California's Unfair Competition Law (Count V). *Id.* ¶¶ 72-106 (J.A. 90-97).

After PhantomALERT submitted its amended complaint as its sole response to Apple's motion, Apple filed a reply brief arguing that (1) its motion should be granted as uncontested because PhantomALERT did not timely oppose it, (2) the amended complaint "should be stricken" because it was filed after the 21-day window to amend a complaint as of right had closed, and (3) the amended complaint was futile in any event because it did not cure the deficiencies Apple's motion identified in the original complaint. Apple Reply ISO Mot. to Dismiss (J.A. 99-114). PhantomALERT responded with motions for leave to amend its complaint and for the court to deem its amended complaint timely filed. The district court issued a minute order denying the latter motion in part because plaintiff "did not request, and the Court did not grant, an extension of time to file a Rule 15(a)(1) amendment." Minute Order of July 26, 2024 (J.A. 4). PhantomALERT then sought leave to late-file its amended complaint, focusing exclusively on a technical error that led to the post-midnight filing. Apple

opposed on the ground that amendment was still futile. In its reply, PhantomALERT for the first time defended its claims on their merits against Apple's argument that neither the original nor the amended complaint states a claim for relief.

After that flurry of filings, the district court entered the order now on appeal. It dismissed PhantomALERT's original complaint without prejudice, deeming it conceded under Local Civil Rule 7(b), and denied plaintiff leave to late-file an amended complaint because doing so "would be futile." Op. 6 (J.A. 230). In support of its futility determination, the court reviewed the allegations of the proffered amended complaint and held that its Sherman Act and Cartwright Act allegations failed "for the same threshold reason": they did not define the relevant product market or geographic market. *Id.* at 9-19 (J.A. 233-43). The court also concluded that plaintiff failed to plead the prerequisites for injunctive relief under California Unfair Competition Law. *Id.* at 19-20 (J.A. 243-44).

## II.

The *de novo* standard of review applies whether we are considering an order dismissing a complaint for failure to state a claim or one denying a motion to amend a complaint based on futility. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022); *Ramos v. Garland*, 77 F.4th 932, 940 (D.C. Cir. 2023). We first confirm the basis of our appellate jurisdiction, which neither party briefed but is not subject to waiver. *See El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 245 (D.C. Cir. 2024). We then evaluate whether the amended complaint states a claim for relief.

## A.

PhantomALERT invokes our appellate jurisdiction under 28 U.S.C. § 1291, which extends only to "final decisions" of

U.S. district courts.  For purposes of Section 1291, a "decision is not final . . . unless it ends litigation on the merits and leaves nothing for the court to do but execute the judgment." *Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999) (quotation marks omitted).

We conclude that we have jurisdiction over this appeal. "Finality under section 1291 turns on whether the district court intended the judgment to represent the final decision in the case," *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) (quotation marks omitted), and here, the order on appeal shows that the district court intended to "disassociate[] itself from [the] case," *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015) (quotation marks omitted). The district court denominated its order "final" and "appealable" and directed the clerk to "close the case."  Order 1 (J.A. 246).  That characterization, while not binding on us, shows "that the district court thought the order had terminated the action." *Ciralsky v. CIA*, 355 F.3d 661, 667 (D.C. Cir. 2004).  The text and context are to the same effect.  The district court dismissed the complaint and denied plaintiff leave to amend because it determined that amendment would be futile, given that the amended complaint would not withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Hall & Assocs. v. EPA*, 956 F.3d 621, 629-30 (D.C. Cir. 2020).  Reading the order's text and accounting for its "surrounding circumstances," *Wolf*, 977 F.3d at 1253, we conclude that it "le[ft] nothing more for the court to do," *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017).  It was, as the district court said, a "final, appealable Order."  Order 1 (J.A. 246).

**B.**

The issue before us *de novo* is whether the amended complaint states a claim for relief. *See* Appellee Br. 16; Reply Br. 2. We conclude that it does not. PhantomALERT must allege relevant product markets for each of its Sherman Act claims, but the amended complaint fails to do so.

As for its tying claim, PhantomALERT never mentions the *per se* theory of liability for tying, so we assume it means to proceed under the more commonly utilized rule of reason. Regardless, "any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold." *Jefferson Parish*, 466 U.S. at 18. That is because an antitrust plaintiff must show either (under the *per se* theory of liability) that the tying and tied goods are in distinct markets and the tie forecloses a substantial volume of commerce in the market for the tied good, *see Microsoft*, 253 F.3d at 85; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997), or (under the rule of reason) that the arrangement produces substantial anticompetitive effects in the tied-good market that are unsupported by any procompetitive rationale defendant has put forward, *see Amex*, 585 U.S. at 541.

So, too, a monopoly claim ordinarily depends on identifying the relevant market in which monopolistic conduct occurred. Market definition "establishes a context for evaluating the defendant's actions"—whether it possesses monopoly power in the relevant market. *Microsoft*, 253 F.3d at 81. To be sure, where there is direct evidence that a firm can "profitably raise prices substantially above the competitive level" (*i.e.*, exercise monopoly power), no market definition is needed. *Id*. at 51; *see Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) (collecting cases). But such

direct evidence is only "rarely available," *Microsoft*, 253 F.3d at 51, and PhantomALERT does not allege it here. More commonly, monopoly power is inferred from "circumstantial evidence" through a "structural approach" that looks to "a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.*; *cf. Amex*, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."). Only once the plaintiff establishes that defendant has monopoly power in a relevant antitrust market do we ask whether that monopoly was acquired or maintained through anticompetitive means—or, conversely, whether a procompetitive rationale explains it. *See Microsoft*, 253 F.3d at 58.

For any antitrust claim, a relevant market consists of "all products reasonably interchangeable by consumers for the same purposes." *Id.* at 52. It is, in short, the "arena within which significant substitution in consumption . . . occurs," *Amex*, 585 U.S. at 543 (quotation marks omitted), and it typically contains both a "geographic" component and a "product" component, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974). We focus here solely on PhantomALERT's deficient product-market allegations "[b]ecause that is all this case requires." *Connelly v. United States*, 602 U.S. 257, 267 n.2 (2024).

To define a relevant product market, antitrust plaintiffs may resort to tools aimed at measuring the "cross-elasticity of demand," defined as the "degree to which a similar product will be substituted for the product in question." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). If products are not realistic substitutes, then they do not compete in the same product market. If, conversely, consumers would, in the absence of the conduct challenged as monopolistic, substitute between products in response to

modest price increases (or economically equivalent quality decreases), then the products compete.

One prominent approach to detecting whether the plaintiff's proposed market definition includes all reasonable substitutes is known as the hypothetical monopolist test. Its basic mechanism is to ask whether a hypothetical monopolist controlling all suppliers in the entire proposed market could profitably impose a "small but significant non-transitory increase in price." *FTC. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008). If so, the market is properly defined; if not, the market definition must be adjusted to encompass any substitutes available to consumers that could limit or negate the profitability of a price increase by the monopolist. *See Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 n.* (D.C. Cir. 2024).

Plaintiffs' proposed market definitions may also rely on various "practical indicia" of a relevant product market, first outlined in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). That case also "introduced into [antitrust] law the concept of submarkets within the relevant market," *Rothery Storage*, 792 F.2d at 218, "which, in themselves, constitute product markets for antitrust purposes," *Brown Shoe Co.*, 370 U.S. at 325. To determine the contours of a market, courts may consider "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325. Our circuit has described the *Brown Shoe* factors as "evidentiary proxies for direct proof of substitutability." *Rothery Storage*, 792 F.2d at 218.

"[T]he process of defining a product market often involves inquiry into economic realities and industry practice," *Nat'l*

*Aviation Trades Ass'n v. Civ. Aeronautics Bd.*, 420 F.2d 209, 213-14 (D.C. Cir. 1969), and so is ordinarily a "deeply fact-intensive inquiry" unsuited to resolution before any opportunity for discovery, *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.). Whatever approach it uses to define the market, an antitrust plaintiff must plausibly allege a product market that bears "a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand." *Id.* at 200 (citation omitted). Such allegations need not be "detailed," but they must consist of "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Scattered through its amended complaint, PhantomALERT postulates the existence of three product markets, one "foremarket" and two related "aftermarkets": (1) a U.S. smartphone market; (2) a market for "access to apps on the iPhone" in which Apple, via the App Store, has a monopoly within the United States; and (3) within that initial aftermarket, a "submarket of access to Covid-19-related tracing apps . . . for use in the United States." Am. Compl. ¶¶ 15-16, 73, 84, 87 (J.A. 71-72, 90-91, 93); *see* Appellant Br. 31. Plaintiff's antitrust claims focus on the latter two.

PhantomALERT's central claims are that Apple has unlawfully tied the App Store to the sale of the iPhone (Count I) and, via the App Store, has maintained a monopoly in the "access to apps on the iPhone" and "access to Covid-19-related tracing apps" markets (Counts II & III). Am. Compl. ¶¶ 72-90 (J.A. 90-94). To prevail on Counts I and II, therefore, PhantomALERT must allege a relevant product market of "access to apps on the iPhone," and to prevail on Count III, it must allege a relevant product market of "access to Covid-19-

related tracing apps." We thus focus on whether plaintiff has adequately alleged any such product markets; we assume without deciding that it has alleged a relevant smartphone market.

**1.**

As just discussed, PhantomALERT alleges that Apple has unlawfully tied the App Store to the sale of the iPhone while simultaneously monopolizing the App Store market (which plaintiff describes as the market for "access to apps on the iPhone") to exclude plaintiff's app. Am. Compl. ¶¶ 74, 84 (J.A. 91, 93). According to PhantomALERT, Apple bundles the App Store with the iPhone and then "forces iPhone users to acquire apps exclusively through the App Store," thus banning the act of "sideloading" apps by downloading them from other app marketplaces or the internet. *Id.* ¶¶ 74-75 (J.A. 91); *see id.* ¶¶ 82-84 (J.A. 92-93). As a result, plaintiff alleges, iPhone users in the United States were unable to access PhantomALERT's updated app at all after Apple rejected it. *Id.* at 6-7 (J.A. 67-68). The amended complaint thus alleges that the App Store constitutes "a special type of market, known as a single-brand aftermarket." Appellant Br. 39.

"[I]n some instances one brand of a product can constitute a separate market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). That occurs most often in "aftermarkets," where "demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023). In *Eastman Kodak*, for example, the demand for the parts and servicing of Kodak photocopiers (the aftermarkets) depended on the purchase of Kodak equipment (the foremarket). *See* 504 U.S. at 456-58.

Our circuit has never articulated the circumstances under which a single-brand aftermarket is accurately defined. On appeal, PhantomALERT presses two alternative theories. Neither succeeds.

The first would find a single-brand aftermarket when customers' foremarket purchases "lock them into the aftermarket," thus preventing substitution away from that brand. Appellant Br. 39-45 (citing *Eastman Kodak*, 504 U.S. 451). Under this theory, if customers are "generally unaware" of an aftermarket restriction when buying a foremarket product, they will be unable to price that restriction into their purchasing decisions. *Id.* at 40. That dynamic can constrain competition in the aftermarket even if the defendant does not have market power in the foremarket. *See* Posner Amicus Br. 9-11. The App Store, according to PhantomALERT, constitutes a single-brand aftermarket for the iPhone because "Apple customers are locked into the App Store" when they purchase iPhones. Appellant Br. 40.

To identify a market under that "lock-in" theory, plaintiff asks us to embrace the test in *Epic Games*. There, the Ninth Circuit held that a plaintiff seeking to identify a single-brand aftermarket must nonetheless show that the market the plaintiff identifies encompasses all reasonable substitutes. *See* 67 F.4th at 977; *see* Appellant Br. 40-44 (tracking the *Epic Games* factors); Oral Arg. Rec. 39:24-54 (plaintiff's counsel stating that the *Epic Games* factors "pretty accurately describe" the appropriate test and "include . . . a general understanding of cross-elasticity"); Posner Amicus Br. 11 (listing *Epic Games* factors). We therefore assume without deciding that such a requirement applies to a complaint alleging a single-brand aftermarket on the basis of *Eastman Kodak*-style lock-in.

The amended complaint does not clear that hurdle. It is bereft of allegations speaking to either a hypothetical monopolist test, the *Brown Shoe* factors, or the availability of substitutes with regard to a market of "access to apps on the iPhone" consisting solely of the App Store. Material relevant to those legal requirements is absent from the amended complaint outside of allegations about the *smartphone* market—allegations copied from a complaint filed by the U.S. Department of Justice in a separate case. *See* Am. Compl. ¶¶ 15-16 (J.A. 71-73) (quoting *United States v. Apple, Inc.*, No. 24-4055 (D.N.J. June 11, 2024), ECF No. 51 (Am. Compl.) ¶¶ 172-79). As already noted, we are assuming that plaintiff has sufficiently alleged the smartphone market. The amended complaint's shortcoming is that it does not plausibly allege a lack of substitutes for the App Store, so fails to plausibly allege that the App Store is a relevant single-brand product market. Indeed, one potential substitute comes immediately to mind: accessing apps on a web browser. *See* Appellee Br. 34-35; *Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1108 (N.D. Cal. 2022) (making this point). Perhaps websites are not a substitute for the App Store in the market for "access to apps on the iPhone." But if they are not, the amended complaint does not explain why.

Resisting this conclusion, PhantomALERT asserts that "practical indicators" and the "hypothetical monopolist test" point to the App Store as a relevant single-brand market. Appellant Br. 37-38; Reply Br. 17-23. But those allegations were never before the district court. The amended complaint barely identifies—much less plausibly alleges—a relevant product market consisting solely of the App Store. That "fail[ure] to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for [it]" dooms plaintiff's attempt to allege a single-brand aftermarket.

*Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023) (quotation marks omitted).

PhantomALERT fares no better on its alternative theory. Plaintiff and its amicus assert that significant market power in the foremarket (here, smartphones in the United States) can enable a defendant to suppress competition in a related aftermarket, regardless of whether customers are locked in to purchasing the aftermarket product (here, the App Store). *See* Appellant Br. 45-48 (citing *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024)); Posner Amicus Br. 6-9. But plaintiff never pressed such a "foremarket power" framework before the district court. *See* Reply ISO LTF at 12-21 (J.A. 211-20). It therefore forfeited any reliance on that theory. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1055 (D.C. Cir. 2017); *compare also* Appellee Br. 40 (arguing that PhantomALERT waived the "foremarket power" theory), *with* Reply Br. 22-24 (failing to address the waiver assertion). Having proceeded solely on a lock-in theory before the district court, PhantomALERT may not switch theories on appeal and ask for reversal on that basis. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 453 (D.C. Cir. 1990).

In sum, the amended complaint does not satisfy a threshold requirement that plaintiff itself has asked us to apply to its primary theory for treating the App Store as a relevant product market, and plaintiff failed to claim in the district court and so has forfeited any reliance on its alternative theory. Either way, PhantomALERT has failed to plausibly allege a single-brand aftermarket consisting of the App Store. That defect dooms Counts I and II in the amended complaint.

**2.**

Plaintiff also alleges that Apple monopolized a "submarket" of the App Store it describes as "access to Covid-

19-related tracing apps in the App Store for use in the United States." Am. Compl. ¶ 87 (J.A. 93). But here, too, the amended complaint fails to adequately draw the boundaries of the proposed market.

The first and most basic problem is that PhantomALERT's own allegations are imprecise and self-contradictory. The amended complaint speaks in terms of a market of "access" to Covid-19-related apps. *Id.* On its own terms, that allegation proposes a market consisting of means to access Covid-19-related apps within the App Store that is distinct from, and contained within, a market consisting of means to access apps on the App Store without limitation as to type of app—a "single-brand subset of an alleged single-brand aftermarket." Appellee Br. 44. But PhantomALERT pervasively confuses a market of "access" to such apps, as it alleged, with the market for such apps themselves, to which it sparingly alludes in its amended complaint and more frequently mentions in its briefing and argument to us. *See, e.g.*, Am. Compl. ¶ 87 (J.A. 93) ("[Covid-19-related apps] are not substitutable for other apps . . . because they perform/ed a specific purpose relating only to Covid-19 tracing and related actions."); Appellant Br. 48 ("PhantomALERT properly alleges that the market for COVID-tracing apps on the iPhone is a relevant antitrust market."); Reply Br. 25 ("PhantomALERT alleged the special non-substitutability of COVID-tracing apps . . . ."); Oral Arg. Rec. 14:53-59 (referring to the "Covid tracing app market" as the "central market").

The two markets are not the same. Just as the App Store is not interchangeable with the apps available on it, a market consisting of "Covid-19-related apps" is distinct from a market of "accessing" such apps. A market of "access" to Covid-19-related apps on the iPhone would include every competitor to the App Store as a means for iPhone users to access Covid-19-

related apps; a market consisting of such apps themselves would include every competitor to PhantomALERT's Covid-tracing app itself.

The amended complaint provides no allegations showing that a market of "access to Covid-19-related tracing apps" exists. At oral argument, plaintiff disclaimed the word "access" in its market definition. Oral Arg. Rec. 17:50-18:12. But that is the framing plaintiff presses in the amended complaint—not once, but multiple times, *see* Am. Compl. ¶¶ 86-90 (J.A. 93-94)—and our review is "limited to the complaint," *Coronavirus Reporter*, 85 F.4th at 956. Besides, "access" is a pivotal term if the proposed product market is to be, in the words of the amended complaint, a "submarket" for access to apps within "the relevant market of the App Store," Am. Compl. ¶ 87 (J.A. 93), as a submarket must be "a smaller grouping within the main market," IIB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 533(b) n.4 (5th ed. 2021), and plaintiff pleads both a market for means to use apps in general and a submarket of means to use Covid-tracing apps as markets for "access."

Even were we to accept plaintiff's belated reframing, moreover, it would fall short. The only allegation about a potential market for "Covid-19-related tracing apps" states simply that such apps "are not substitutable for other apps" because they perform a "specific purpose relating only to Covid-19 tracing and related actions." Am. Compl. ¶ 87 (J.A. 93). Such a bare, unadorned assertion is little more than a "label[] and conclusion[]." *Twombly*, 550 U.S. at 555. The district court therefore correctly concluded that PhantomALERT had not plausibly alleged a "submarket" consisting of Covid-19-related apps on the iPhone, much less of access to such apps. Count III of the amended complaint accordingly fails to state a claim.

\* \* \*

The amended complaint does not plausibly allege the product markets on which its Sherman Act counts are premised. It therefore does not state a claim for relief under that statute. PhantomALERT does not dispute the district court's conclusion that the California Cartwright Act count rises or falls with the Sherman Act allegations, *see* Op. 8 (J.A. 232) (first citing *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); and then citing *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002)), so we do not separately address that claim. Plaintiff also does not appeal, and has forfeited any challenge to, the district court's dismissal of the California Unfair Competition Law claim. *See id.* at 19-21 (J.A. 243-45). We therefore affirm the district court's conclusion that the amended complaint fails to state a claim for relief.

**III.**

One final wrinkle bears ironing out. PhantomALERT expressed concern at oral argument that the district court's judgment not be treated as dismissal "with prejudice." Oral Arg. Rec. 0:35-1:12, 24:19-27:45 (citing *Moyar v. U.S. Dep't of Def.*, 2024 WL 2795958 (D.C. Cir. May 31, 2024) (per curiam)). A with-prejudice dismissal of the case might have carried *res judicata* effect. *See Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 478 (D.C. Cir. 2016). Unlike in *Moyar*, however, the district court here did not hold that no conceivable amended pleading could "'possibly cure the deficiency' warranting dismissal in the first place," *Moyar*, 2024 WL 2795958, at \*4 (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)), but only that plaintiff's proffered amended complaint did not do so, *see* Op. 6, 21 (J.A. 230, 245). Measured by this circuit's "high" bar for dismissing an action

with prejudice, *Belizan*, 434 F.3d at 583, we see no reason to construe the district court's order here to have effected such a dismissal.  Provided it could clear any other limitations to suit, PhantomALERT remains free to file a separate action in the district court.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) (dismissal without prejudice does not have *res judicata* effect).

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*